**[J-48-2013]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

**CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, STEVENS, JJ.**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 99 MAP 2012 |
| | : | |
| Appellant | : | Appeal from the order of Superior Court at |
| | : | 646 MDA 2011, dated March 1, 2012, |
| | : | reversing the PCRA Order of the Dauphin |
| v. | : | County Court of Common Pleas at No. |
| | : | CP-22-CR-0001407-1998, dated |
| | : | December 27, 2006. |
| ELTON EUGENE HILL, | : | |
| | : | 42 A.3d 1085 (Pa. Super. 2012) |
| Appellee | : | |
| | : | SUBMITTED:  May 3, 2013 |

**OPINION**

**MR. CHIEF JUSTICE CASTILLE**                    **DECIDED:  November 21, 2014**

In this Post Conviction Relief Act ("PCRA")[1] appeal, we consider a claim of ineffective assistance of counsel relative to counsel's failure to seek suppression of an inculpatory post-polygraph statement made subsequent to a pre-polygraph counseled waiver of the federal constitutional rights afforded under Miranda v. Arizona, 384 U.S. 436 (1966).  The PCRA court below denied relief.  A divided Superior Court reversed and remanded in a 2-1 decision, in the process adopting and applying a test for measuring Miranda waivers devised by the U.S. Circuit Court of Appeals for the First Circuit after the trial in this matter.  The panel majority held that: appellee's pre-polygraph Miranda waiver did not encompass the post-polygraph interview; the

---

[1] 42 Pa.C.S. §§ 9541-9546.

Commonwealth failed to prove that appellee validly waived his Sixth Amendment right to counsel for the post-polygraph interview; appellee's trial counsel lacked a reasonable basis for failing to seek suppression of the statement; and the admission of the statement at trial was prejudicial. We accepted review because the Superior Court's approach led to an underlying merits holding – that federal law may require a second set of Miranda warnings and a second Miranda waiver before police may conduct a post-polygraph interview – that presents an important issue of first impression. For reasons that follow, we hold that the Superior Court's approach was flawed in multiple respects, requiring a remand to that court to reconsider the ineffectiveness claim under the proper review paradigm. Accordingly, we vacate the order of the Superior Court and remand for reconsideration of the issue consistently with this Opinion, and for consideration of appellee's remaining appellate issue.

Because the issue involves a failure to seek suppression, there is no pre-trial suppression hearing record. The courts below focused on competing factual accounts, including appellee's testimony, offered at the PCRA hearing, without looking to the trial record; the parties' appellate presentation to this Court has a similar focus. However, because appellee's various statements to police were introduced at trial, the trial transcript also includes substantial evidence relevant to the circumstances surrounding those statements. The failure to recognize relevant evidence in the trial record contributed to the Superior Court's ultimate legal error, as we will explain. Given these circumstances, we must begin with a factual and procedural overview essential to obtain an accurate understanding of the merits issue.

**I.**

The trial evidence, which included various statements appellee made to police investigators as well as appellee's own testimony, established that after leaving a party

in the early morning hours of April 18, 1998, appellee and James Purcell engaged in a pattern of destructive behavior which included Purcell using a baseball bat to smash mailboxes while leaning from the front-passenger-side window of appellee's vehicle, as appellee drove the vehicle. At some point in their travels, appellee passed the home of a family (the victims) in Dauphin County, and appellee told Purcell that he would not mind assaulting the victims' teenage son. Thereafter, appellee and Purcell returned to the residence and stood outside of the victims' home, appellee handed Purcell the baseball bat, and Purcell proceeded to enter the home.

At that time, the wife and two young children, 5 and 2 years of age, were asleep in the master bedroom. The husband earlier had retired to sleep in another room. Purcell eventually entered the master bedroom, where he awoke the wife and terrorized her by threatening to assault her sleeping children. Purcell began to rape the wife as she pleaded with him not to hurt her children.

Awakened by the commotion and the sound of appellee's car outside, the husband came to his wife's defense, attacking Purcell as he struggled to pull his pants up. The husband beat Purcell into submission and dragged him from the bedroom, not wanting to kill him in front of the children. The victims' teenage son then assisted his father, wielding a baseball bat of his own. As the son stood over Purcell, the husband ran outside in search of other possible intruders, given the sound of appellee's car and the fact that the husband thought he had heard more than one strange voice in his house. The husband then saw appellee, age 17 at the time,[2] sitting in a car positioned at the bottom of the driveway, with its engine running, and headlights turned off. Appellee fled upon seeing the husband, who then pursued appellee in his own vehicle. Appellee eluded the husband and then attempted to run him off the road by driving

_____

[2] Appellee turned 18 four months later on August 15, 1998.

head-on at the husband's car at a high rate of speed. The husband then returned to his home and the police arrived shortly thereafter and arrested Purcell.

The following morning, based on information received from Purcell, Derry Township police officers went to appellee's home to interview him. According to the trial testimony of Detective Daniel Kelly, the detective sergeant in charge of the criminal investigation section of the Derry Township Police Department, appellee told police that on his way home the night before, he dropped Purcell off in front of the victims' home, that appellee never saw Purcell with a bat, and that there was never any bat in appellee's car.

Two days later, on April 21, 1998, detectives, including Detective Kelly again, returned to appellee's home. Detective Kelly asked appellee to meet him at the police station and appellee agreed and followed the detectives in his own vehicle. Upon arrival, police escorted him to an interrogation room to wait for his parents, who were not home when the detectives invited appellee to the station.

The accounts concerning appellee's ensuing interactions with, and statements to, the police are found in both the trial record and the PCRA proceedings. Appellee testified at the PCRA hearing that, when he arrived at the police station, he was seated in a small room with the door closed and was made to empty his pockets. He testified to a subjective belief that he did not have the ability to leave, that he waited for "a couple of hours" before his parents arrived, and that he was not questioned by police prior to his parents' arrival. Appellee conceded, however, that the room had two doors and that when he had to use the bathroom he may have opened the door himself and, upon leaving the bathroom, he walked directly back to the interview room. Appellee also acknowledged that he was not handcuffed, shackled, or otherwise physically restrained in any way. Appellee claimed that, before his parents arrived, he asked

police, "Why are you keeping me here?" and police responded: "We're holding you here until your parents arrive so we can ask you some questions or question you." N.T., 4/25/06, at 63-65, 69.

In his own PCRA testimony, Detective Kelly stated that the room in which appellee waited had two doors: a door to the hallway which remained open, and a door to the lock-up/booking area which remained closed to keep juveniles separate from adult offenders. Detective Kelly explained that appellee was neither restrained nor kept under guard, and that he was never told he was not free to leave, albeit police also did not specifically inform appellee that he had the right to leave.

After appellee's parents arrived, Detective Kelly advised them and appellee of appellee's Miranda rights. At the PCRA hearing, appellee claimed that: "When he got to the part about the attorney, we asked, I believe my father or my mother asked, and I asked, both, for an attorney. . . . We specifically said if we have the right to one, we would like one." Appellee said that the police response was "No," and "you don't need an attorney at this point." Id. at 66-67. Appellee's father, also testifying during PCRA proceedings, confirmed: "I indicated we wanted a lawyer." Id. at 94. Appellee further testified that he did not sign the Miranda waiver form presented to him because: "Well, I kind of thought I needed an attorney. They told me I had . . . the right to an attorney and then they told me I couldn't have one." Id. at 67. Detective Kelly's PCRA testimony specifically contradicted appellee and his father, as he testified that appellee never invoked his right to silence or his right to counsel.

Appellee and his parents then spoke privately before appellee's father invited the detectives back into the room and, according to Detective Kelly, the parents indicated that they understood the rights and were willing to allow police to speak to appellee without the presence of an attorney. Appellee's father admitted to signing a

"Constitutional Rights Notice" consenting to the interview, but stated that at some later point, he refused to sign the Miranda Waiver form. Appellee's father was present when appellee was questioned and, he admitted, "the questions they asked him, I did consent to." Id. at 94-97. For his part, Detective Kelly testified that the Constitutional Rights Notice and the "Waiver of Rights Miranda Warnings" form were actually two parts of the same document; appellee's parents signed the document where Detective Kelly requested they sign; and the failure to have them sign a second time at the bottom of the same form was merely his error and, in any event, the second part of the form is redundant. Id. at 101-102.

Detective Kelly proceeded to take a written statement from appellee, the contents of which were introduced, through the testimony of the detective, at trial. Appellee admitted to being at a party with Purcell on the evening of April 17, 1998, and then driving home with Purcell in the early morning hours of April 18. According to appellee, Purcell exited appellee's vehicle with a baseball bat, which was the first time appellee had seen the bat. Purcell swung the bat against the windshield of appellee's car, cracking the windshield, then swung the bat at appellee and another individual, Wes Sumner, who had also been in the car. Purcell then walked away carrying the bat, and appellee entered his own house. Upon seeing police lights ten to fifteen minutes later, appellee stated, he assumed Purcell had been taken into custody by the police, and the next thing that he knew the police were at his door at 8:30 or 9 a.m. the next morning. After reviewing his typewritten statement with his parents, appellee made and initialed corrections, and signed the statement, with his parents present. Appellee was then arrested and detained in the Dauphin County Prison.

On April 24, 1998, Detective Kelly filed a criminal complaint charging appellee with various criminal offenses, including burglary, rape and various categories of

assault. Appellee's parents retained trial counsel, who met with appellee and discussed his April 21st statement. At the PCRA hearing, appellee said he did not think to inform counsel that he had requested an attorney prior to the interview on the 21st.

On April 25, 1998, Detective Kelly and another detective transported appellee from the county prison to the police station and escorted him to the interview room where trial counsel was waiting. Counsel informed appellee that appellee would be given a polygraph examination to confirm the veracity of his April 21st statement. At the PCRA hearing, appellee said counsel spoke to him about a polygraph examination and told him: "Just tell the truth and you will be fine." N.T., 7/27/06, at 32; see also N.T., 4/25/06, at 71. According to trial counsel's PCRA hearing testimony, appellee had told counsel he was innocent, did not enter the victims' house, and was "not involved at all." Explaining his reasoning respecting the polygraph, counsel stated:

> He [appellee] was going to take a polygraph test. We discussed that at length. I felt that since the District Attorney was willing to give him that polygraph test that they were attempting to determine that he was - - possibly he was not guilty of the burglary or anything that took place and that they wanted to do that.
>
> And I felt, if anything, the polygraph would be very, very helpful because I was convinced by what he said to me that he was telling the truth and a polygraph would only be good.
>
> I know the person who was going to take the polygraph test down there in Derry Township. He's been doing it for a long time and very fair and very kind, a very good person. I felt that he would get along well with [appellee]. I also felt with [appellee] telling the truth, I thought this could possibly be an outstanding result for us.

N.T., 4/25/06, at 13-14. Counsel also explained that in his nearly forty years of experience, both as a prosecutor and a defense attorney, the polygraph process included three phases: a pre-polygraph interview, the examination itself, and a post-

polygraph interview. He explained that defense counsel is not permitted to be present in the room for any portion of the polygraph testing process, and indeed, if the attorney insisted on being present, no polygraph would be administered. Relying on appellee's account of his non-involvement, however, counsel "absolutely" believed the polygraph would be "a very positive thing" for appellee. Id. at 49-50. The polygraph examiner, Detective Joseph Steenson, confirmed the protocol that polygraph examinations are not administered with attorneys present. N.T., 7/27/06, at 22.

Prior to the polygraph, counsel met with a representative of the district attorney's office and Detective Steenson to review the questions to be asked. According to appellee's trial testimony, counsel also consulted with appellee concerning his rights, and was present when appellee executed a pre-polygraph written waiver of those rights. N.T., 11/19/98, at 599-602. Counsel then waited outside of the examination room while Detective Steenson proceeded with the polygraph, but counsel departed upon receiving a call indicating he was needed in his office and counsel did not return.

During the PCRA proceedings, Detective Steenson testified that he served the Derry Township Police Department and surrounding areas as a polygraph examiner from 1994 until his retirement in 2000, and he administered appellee's polygraph examination. Detective Steenson testified that he routinely compiled and utilized a polygraph packet that included a specific series of forms. He testified to a present recollection of appellee's polygraph examination and the forms used, including that he read the Miranda waiver form to appellee verbatim prior to conducting the polygraph exam, as part of his routine process. Detective Steenson said he was certain that he read each of the questions aloud to appellee, and that appellee answered "yes" each time. He further testified that had appellee answered "no," or had he given any

equivocation, he would have stopped the polygraph. Additionally, Detective Steenson testified that appellee signed the waiver after his affirmative answers.

As noted by the Superior Court below, at some time between appellee's trial in 1998 and his PCRA hearing in 2006, the actual waiver form he signed prior to the polygraph examination was lost. However, the court and the parties apparently failed to read the trial transcript, where the content of the form was memorialized because Detective Kelly read it into the record, without objection, as Commonwealth's Exhibit Number 24:

> "You have a constitutional right to remain silent, and you do not have to talk to me or answer any of my questions. Do you understand this?"
>
>> And there is yes, no, after that question, and yes is circled. And it is initialed E.H. for [appellee].
>
> "If you talk to me, anything you say can be used against you in a court of law. Do you understand this?"
>
>> Again, yes is circled and E.H. is beside it.
>
> "You have a right to have an attorney present to speak with before and during questioning if you so desire. Do you understand this?"
>
>> Yes is circled and E.H. is beside it.
>
> "If you cannot afford an attorney, the court will appoint one to you at no cost." In parenthesis it says, (public defender). "Do you understand this?"
>
>> Again, yes is circled and E.H. is beside it.
>
> "You can decide at any time not to answer any questions or not to make any statements. Do you understand this?"
>
>> Yes is circled and E.H. is underneath of it.
>
> "Having been read and fully understanding these rights, do you consent to talk with me without the presence of an attorney, and will you answer my questions?"
>
>> Yes is circled, E.H. is under yes, and then it is signed by [appellee]. It is dated 4/25/98, Saturday. And

under that, it is signed by Detective Steenson, dated 4/25/98.

N.T., 11/18/98, at 337-39.[3]

Appellee testified at the PCRA hearing that he did not recall whether Detective Steenson read the constitutional rights waiver form to him. However, during trial, appellee authenticated the actual form used, as well as his initials and signature on it. He also affirmed the contents of the waiver and that he decided to talk with the detectives based on discussing his rights with trial counsel. N.T., 11/19/98, at 599-602. Appellee further conceded during his PCRA testimony that he never requested a lawyer on April 25, 1998; he did not invoke his right to silence; and he was familiar with his Miranda rights, having already been advised of those rights four days earlier, on April 21st. N.T., 4/25/06, at 88-90. Detective Kelly corroborated these concessions, and added that appellee never asked to end the questioning. Id. at 106.[4]

---

[3] In his PCRA testimony, Detective Steenson read into the record a blank waiver form that he said was typical of the form read to potential polygraph test-takers. N.T., 7/27/06, at 11–13. This form is nearly identical to the actual form signed by appellee and read into the record during appellee's trial. As noted by the panel majority, Detective Kelly testified at the PCRA hearing that the waiver form itself was not introduced at trial because the standard waiver form employed had the word "polygraph" inserted in several locations. 42 A.3d at 1095-96, citing N.T. 4/25/06, at 119.

[4] Although appellee conceded that he did not request a lawyer on April 25, 1998, this concession is in contradiction to other portions of his testimony as noted *infra*. Elsewhere he insisted that he asked for his lawyer on that date, but only after failing the polygraph examination and giving his post-polygraph statement to Detective Steenson. Thus, appellee elsewhere claimed to have asked for his lawyer post-polygraph after Detective Kelly entered the room where the polygraph was administered. Detective Kelly maintained, however, that appellee made no such request. The PCRA court credited Detective Kelly's version of events, which corroborated appellee's concessions, specifically finding: "The Defendant never invoked his right to silence or to counsel during the interview on April 25, 1998." Order, 12/27/06, at ¶ 13.

At the conclusion of the polygraph examination, Detective Steenson informed appellee that he had failed the exam, and the detective proceeded to take a written statement from appellee which, Detective Steenson explained, was standard polygraph procedure in every case. Id. at 23-24. Appellee's written post-polygraph statement was read into the record by both Detective Kelly and appellee during trial, and it contradicted appellee's written statement of April 21st in several respects. Specifically, appellee related that: Upon arrival at appellee's home, Purcell suggested that the group take appellee's dog for a walk. Appellee admitted that the baseball bat was in his car. Appellee followed Purcell and the dog toward the victims' home, and Sumner retrieved the bat and joined them. Sumner stopped across the street from the victims' house, where Purcell dropped the dog's leash and appellee picked it up. Appellee handed the leash to Sumner, who handed him the bat. Appellee then continued to follow Purcell as Sumner returned to appellee's house with the dog. At some point, appellee said of the victims' son, "I think he's a prick and I wouldn't mind beating his ass." N.T., 11/18/98, at 285.

According to the statement, Purcell and appellee then proceeded to the victims' home and walked to the back of the house, where Purcell pointed to the cellar window and told appellee to enter. Appellee refused, and the duo proceeded to the side of the house where appellee handed Purcell the bat. Appellee claimed that he did so in fear of his own bodily injury. Appellee then told Purcell not to do anything stupid, and that he would return with the car. Appellee returned to his house and asked Sumner to help him get Purcell into the car, but Sumner refused. Appellee then drove back to the victims' home, where he saw in the window what looked like a struggle, and someone being struck with a bat. Appellee then drove off upon seeing someone exiting the

house. Appellee admitted signing the written post-polygraph statement. Id. at 285-86, 329.

At the PCRA hearing, appellee testified that the polygraph process, including the above interview, lasted about an hour, and that thereafter, Detective Steenson told appellee that they were going to return him to the prison. Detective Steenson then left the room for approximately fifteen minutes. N.T., 4/25/06, at 90. In the interim, Detective Kelly reviewed the post-polygraph statement, and then entered the interview room to confront appellee with discrepancies between his first statement to police on April 18th, his written statement on April 21st, and his April 25th written post-polygraph statement. Detective Steenson remained in the room for part of Detective Kelly's interview, but left before it ended, an account corroborated by appellee's trial testimony.

At the PCRA hearing, appellee testified that when Detective Kelly began questioning him no additional Miranda warnings were issued. Appellee further claimed that when he asked where his attorney was, he "was told he was not there." N.T., 4/25/06, at 73. Appellee then claimed to have stated, while both Detectives Kelly and Steenson were present, "Where is [trial counsel], I would like to speak to [trial counsel]." According to appellee, the ensuing second post-polygraph interview lasted "[p]robably more than an hour," and he was given no opportunity to call his lawyer. Id. at 72-73, 89-90. In his PCRA testimony, Detective Kelly testified that appellee was not specifically informed post-polygraph that he could consult with trial counsel regarding follow-up questioning.

Notably, at trial, both Detective Kelly and appellee testified concerning the second post-polygraph interview. Detective Kelly explained that, "When I sat down, I indicated to [appellee] that I was aware he had his Miranda rights and he was aware of his Miranda rights. He indicated that he was, and I conducted the interview at that

point." N.T., 11/18/98, at 324. Appellee's trial account of the follow-up interrogation confirmed that he was aware of his <u>Miranda</u> rights:

> Q      Did you say- - you have indicated you are an intelligent man. You got high SAT scores. You were going to drop out, go to college, get your GED. You are obviously bright.
>
> You have called them Miranda rights. You already knew what they were before I showed you. You knew you had the right not to answer the questions, didn't you?
>
> A      Yes, I did.
>
> Q      You knew you had the right, at any point, to say, Stop, I am done, didn't you?
>
> A      Yes, I did.
>
> Q      So this part about being badgered and being threatened and Detective Kelly's voice being raised, you knew you had the right, at any point during that questioning, to stop answering questions?
>
> A      Yes, I did.
>
> Q      It made no difference what Sergeant Kelly's demeanor was or what you say it was, because you knew before you started, and you knew because you probably knew beforehand about Miranda, that you had the right not to answer the questions that the police officers were asking, right?
>
> A      Yes.

<u>Id.</u> at 608-09.

The contents of appellee's second post-polygraph statement were introduced at trial through the testimony of Detective Kelly. In addition to other inconsistencies, appellee admitted to Detective Kelly that he had been drinking at the party as well as smoking marijuana, and that he was playing "mailbox baseball," *i.e.*, driving his car while Purcell swung the bat at random mailboxes. Appellee further admitted that he had indicated the victims' home to his passengers as he drove to his own home; that he and

Purcell looked into the basement windows of the victims' home together to see whether anyone was present; and that the two discussed appellee entering through a basement window, to then climb the stairs and admit Purcell through the kitchen door. However, appellee claimed, he ultimately left to retrieve his car without entering the victims' home, telling Purcell, "Don't do anything stupid until I get back." Appellee returned with his car and waited for five to ten minutes. When Detective Kelly asked appellee why he did not call the police once he realized Purcell was in the victims' home and saw what looked like someone being struck with the bat, appellee cried uncontrollably for ten minutes, saying he did not want to go to jail. Id. at 286-310.

At the PCRA hearing, appellee testified that he alerted his trial counsel to the existence of his second written statement, and also told counsel that he had requested a lawyer on April 21st, and was told that he did not need one. When the April 21st and 25th statements were introduced during trial, appellee further claimed, he said to counsel: "I thought they couldn't use that statement," but counsel responded, each time, "they can" and "Don't worry about them." N.T., 4/25/06, at 80-81.

Trial counsel did not move to suppress the statements appellee made on April 25, 1998. Counsel testified concerning this decision at the PCRA hearing. Counsel stated that he could not recall whether Detective Kelly informed him ahead of time that he would be taking a post-polygraph statement; that in his experience it was not unusual for someone other than the examiner to conduct post-polygraph questioning; and that in this case, counsel did not believe anyone other than the polygraph examiner would question appellee. Id. at 17, 51. Counsel testified that he noticed inconsistencies between appellee's April 21st statement and his post-polygraph account, but he did not believe the inconsistencies would hurt appellee's case before a jury. Counsel explained that, in his judgment, reasonable people would understand a scared seventeen-year-old

giving accounts with some inconsistencies because, "now he feels, 'I want to tell the truth, I want to tell exactly what happened.'" Id. at 21. Asked whether he considered filing a motion to suppress the April 25th statement, counsel responded,

> Absolutely not. I thought that second statement was very clear in terms of the fact that [appellee] never entered that house . . . . There were some inconsistencies, there was never any admission or anything like that, that he had done anything but try and help. So I don't think the second statement was a negative. I think it was a young man who finally fessed up, indicated what happened and I thought the statement, in my mind, and I still feel that way, was helpful to him.

Id. at 22.

On November 20, 1998, a jury convicted appellee of burglary, aggravated assault, three counts of simple assault, multiple counts of criminal conspiracy, possession of an instrument of crime, possession of a prohibited offensive weapon, and recklessly endangering another person. On March 15, 1999, the trial court sentenced appellee to an aggregate term of fifteen and one-half to eighty-four years in prison. Represented by new counsel, appellee appealed to the Superior Court, challenging the sufficiency of the evidence, and raising two claims of trial counsel ineffectiveness, neither of which involved the failure to move to suppress his statements to police. The Superior Court affirmed the judgment of sentence, and this Court denied allocatur. Commonwealth v. Hill, 777 A.2d 503 (Pa. Super. 2001), appeal denied, 790 A.2d 1014 (Pa. 2001).

The ensuing procedural history was protracted and complicated, including a series of *pro se* filings, ultimately treated as a PCRA petition; the appointment of counsel; a no-merit letter and motion to withdraw filed by counsel; a *pro se* response and supplemental petition in which appellee, for the first time, identified a claim that his

police statement should have been deemed inadmissible as coerced; an order granting counsel's motion to withdraw and dismissing the PCRA petition with the court finding, *inter alia*, that appellee's supplemental claims were time-barred; and a timely PCRA appeal filed by privately-retained counsel. Counsel on that PCRA appeal pursued two claims, neither of which involved the admissibility of appellee's police statements. On April 7, 2005, a Superior Court panel issued a memorandum and order vacating and remanding to the PCRA court. Although the panel found no merit in the claims appellee actually raised on appeal, the panel *sua sponte* determined that the PCRA court should have considered appellee's *pro se* supplemental PCRA petition because his initial *pro se* filing was timely, and the supplemental PCRA petition was filed eleven months before a final order by the PCRA court. The panel remanded the case and authorized appellee to pursue claims concerning the circumstances of his statements to police and expressly held that, in pursuing his PCRA petition, appellee would not be limited to the claims raised before the Superior Court. The Commonwealth did not seek review of the decision in this Court.[5]

---

[5] The propriety of the Superior Court's initial remand is not before us; we comment on the remand only because, in multiple cases post-dating that remand, this Court has considered and disapproved various procedures adopted by the Superior Court in addressing PCRA appeals, procedures that may explain the 2005 remand. See, e.g., Commonwealth v. Pitts, 981 A.2d 875 (Pa. 2009); Commonwealth v. Liston, 977 A.2d 1089 (Pa. 2009); id. at 1095-99 (Castille, C.J., concurring, joined by Saylor and Eakin, JJ.) (discussing complications caused by Superior Court precedent, *i.e.*, Commonwealth v. Miranda, 442 A.2d 1133 (Pa. Super. 1982) (*en banc*)); Commonwealth v. Jette, 23 A.3d 1032 (Pa. 2011) (discussing and disapproving procedure set forth in Commonwealth v. Battle, 879 A.2d 266 (Pa. Super. 2005)). See also Commonwealth v. Holmes, 79 A.3d 562, 565-67 (Pa. 2013) (discussing Liston). Cf. Commonwealth v. Brown, 943 A.2d 264, 267-68 & n.3 (Pa. 2008) (collecting earlier cases). To the extent the initial PCRA remand may be in tension with later decisional law from this Court, our recitation of the procedural history in text does nothing to undermine the controlling effect of our later decisions.

On June 6, 2005, appellee filed a new PCRA petition raising some sixteen allegations of trial counsel ineffectiveness; he then supplemented or amended the petition three different times. The PCRA court held evidentiary hearings on April 25, 2006 and July 27, 2006. In supplemental briefing, appellee narrowed his issues to three, including, as pertinent here, whether trial counsel was ineffective for failing to: (1) move to suppress his April 21, 1998 statement to police; and (2) move to suppress his April 25, 1998 statement. Supplemental Brief in Support of PCRA Petition, at 2-3 ("Supp. Br."). Appellee argued that trial counsel was "incompetent" for failing to move to suppress the "two statements" he provided police on April 21 and April 25, 1998 (in fact, appellee gave one written statement on April 21st, and two statements on the 25th: a written statement to Detective Steenson and an oral statement to Detective Kelly). Appellee's argument assumed the following as facts: that appellee and his parents "specifically requested counsel" before the April 21st interview but they were told by police that they would not need counsel; neither appellee nor his parents ever executed the Miranda waiver provided by police; Detective Kelly did not advise appellee of his right to counsel after the polygraph examination on April 25th; the polygraph examiner was not present during Detective Kelly's questioning that day; and appellee was not questioned by Kelly in the same area where the polygraph had taken place. Appellee then argued that "[t]he pivotal issue" concerning the April 25th statement was "whether once counsel is waived and questioning begins anew, does that waiver of rights extend to a separate distinct interrogation of which [appellee's] counsel is not aware." Supp. Br. at 3-4, 6-7.

The PCRA court dismissed the amended PCRA petition on December 27, 2006. Respecting the April 21st interview, the court found that: Detective Kelly apprised appellee of his Miranda rights in the presence of his parents; appellee consulted alone

with his parents; appellee's father summoned the police back into the room and his parents indicated their consent to an interview of appellee; appellee orally indicated that he understood his Miranda rights and was willing to submit to questioning; Detective Kelly inadvertently failed to obtain a signed waiver; neither appellee nor his parents invoked the right to silence or to the presence of an attorney during the April 21st interview; and, until his subsequent arrest, appellee was not restrained in any way. Order, 12/27/06, at ¶¶ 1-8.

Respecting the April 25th interviews, the PCRA court found that: appellee consulted in person with his counsel, an experienced practitioner, prior to the polygraph examination; after that consultation, appellee agreed to submit to questioning by police as part of the polygraph process; Detective Steenson advised appellee of his Miranda rights prior to the exam; appellee executed a written waiver of his Miranda rights, although that written waiver could not presently be located; after the examination, Detective Steenson informed appellee that he had failed; thereafter, Detectives Steenson and Kelly interviewed appellee and he made additional incriminating statements; those statements were part of the interview to which appellee submitted as part of the Miranda waiver and were part of the polygraph process; appellee never invoked his right to silence or to counsel during the interview; and police made no threats or promises before or during the interview. Id. at ¶¶ 9-17. The court also credited trial counsel's account that he anticipated that the polygraph process would include a pre-test interview and a post-test interview, as was customary; counsel did not insist on being present since he knew that if he had, the polygraph would not be administered; and counsel believed that "taking the polygraph was in his client's best interests based on [appellee's] assertion of innocence, and the facts of the case as outlined by [appellee] to . . . counsel." Id. at ¶¶ 15-16.

Based upon these factual findings, the court concluded that appellee was properly informed of his rights by police and knowingly, intelligently and voluntarily consented to making the statements he gave police on both April 21st and April 25th.

PCRA counsel forwarded a notice of appeal to the PCRA judge, but evidently failed to actually file the notice, leading to confusion and further delay. Ultimately, the appeal was not processed for three years; eventually, on November 15, 2010, appellee filed a *pro se* petition seeking reinstatement of his PCRA appeal rights *nunc pro tunc.* On November 22, 2010, the PCRA court appointed current counsel, and on March 23, 2011, reinstated appellee's PCRA appeal rights.[6] The court later noted that its December 27, 2006 order sufficiently set forth the basis for its decision.

Before the Superior Court, appellee pursued both ineffectiveness claims, arguing that (1) the April 21st statement was obtained in violation of <u>Miranda</u>, and (2) the April 25th post-polygraph statement was obtained in violation of his right to counsel, notwithstanding his waiver of rights for purposes of the polygraph examination.[7] A divided Superior Court panel issued an opinion and order reversing the PCRA court's dismissal and remanding the matter for further proceedings – a new trial – holding that trial counsel was ineffective in failing to move to suppress appellee's post-polygraph

---

[6] The Commonwealth did not appeal from, and has not otherwise contested, the propriety of this reinstatement.

[7] The Superior Court's opinion indicates that appellee's second issue added the notion that appellee was deprived of effective assistance of counsel when his trial attorney abandoned him at a critical stage in the proceedings. That distinct issue was not addressed by the Superior Court on the merits, and it is not before this Court.

statement to Detective Kelly. The panel declined to address appellee's claim respecting his April 21st statement.[8]

The panel majority began by noting the judicially-settled performance and prejudice test for assessing ineffectiveness claims, albeit the panel did not acknowledge either the constitutional presumption of effectiveness, or the requirement of contemporaneity, *i.e.*, that counsel's actions cannot be viewed through hindsight but must be examined according to the law and circumstances at the time counsel acted.[9]

---

[8] As recited in the panel majority opinion below, appellee's statement of the issue referred to a post-polygraph "statement," but in the very next paragraph of the opinion, the majority characterized the issue as a challenge to both of appellee's post-polygraph "statements." 42 A.3d at 1089. In any event, the panel's analysis was limited to the statement made to Detective Kelly, and its holding was tied to the circumstances surrounding that statement (including that he was not the officer who had administered the polygraph). See discussion infra. It is not clear whether the panel deemed the challenge to the statement to Detective Steenson to be waived, or if the panel determined that it did not need to reach the issue.

[9] The seminal decision concerning ineffective assistance of counsel is Strickland v. Washington, 466 U.S. 668 (1984), which stressed:

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. . . . A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances,

(…continued)

The court then noted that appellee's Sixth Amendment right to counsel had attached before the polygraph examination, and appellee's waiver of his rights clearly encompassed the right to counsel "for purposes of the polygraph." In the court's view, then, the underlying issue turned on the "scope" of that waiver, that is, was the waiver limited to the polygraph examination, or did it also encompass the post-polygraph interview.

Significantly, the panel majority recognized that the U.S. Supreme Court had addressed the general issue in <u>Wyrick v. Fields</u>, 459 U.S. 42 (1982) *(per curiam)*. In <u>Wyrick</u>, the panel noted, the High Court had rejected a bright-line rule fashioned by the Eighth Circuit that would have required re-advising suspects of their <u>Miranda</u> rights before a post-polygraph interview commences, in favor of a rule, deriving from existing High Court authority, requiring examination of the totality of the circumstances. The panel continued by noting that the circumstances in <u>Wyrick</u> included that the defendant, Fields, had requested the polygraph examination; the post-polygraph examination was conducted by the polygraph examiner; and Fields' written waiver included broader language than a standard <u>Miranda</u> warning and waiver, in that it advised him that "If you are now going to discuss the offense . . . without a lawyer present, you have a right to stop answering questions at any time or speak to a lawyer before answering further, even if you sign a waiver." 42 A.3d at 1092-93, citing <u>Wyrick</u>, 459 U.S. at 43-47. Further explaining its understanding of <u>Wyrick</u>, the panel then cited this portion of

---

(continued…)
> the challenged action "might be considered sound trial strategy."

466 U.S. at 689 (citations omitted).

Wyrick's reasoning in rejecting the notion that police were obliged to re-warn Fields of the rights he had just been apprised of:

> The Court of Appeals stated that there was no indication that Fields or his lawyer anticipated that Fields would be asked questions after the examination. But it would have been unreasonable for Fields and his attorneys to assume that Fields would not be informed of the polygraph readings and asked to explain any unfavorable result. Moreover, Fields had been informed that he could stop the questioning at any time, and could request at any time that his lawyer join him. Merely disconnecting the polygraph equipment could not remove this knowledge from Fields' mind.
>
> . . . .
>
> [The Eighth Circuit's rule certainly finds no support in Edwards [v. Arizona, 451 U.S. 477 (1981)], which emphasizes that the totality of the circumstances, including the fact that the suspect initiated the questioning, is controlling. Nor is the rule logical;] the questions put to Fields after the examination would not have caused him to forget the rights of which he had been advised and which he had understood moments before. The rule is simply an unjustifiable restriction on reasonable police questioning.

42 A.3d at 1093, quoting Wyrick, 459 U.S. at 47-49.[10]

The panel majority then reviewed decisions from the Ninth, Third, and First Circuits involving application of Wyrick, while recognizing that, "[i]t does not appear that any Pennsylvania appellate court has addressed the issue of waiver of the Sixth Amendment right to counsel in connection with post-polygraph interrogations." Id. at 1094-95. Deeming the First Circuit's approach in U.S. v. Leon-Delfis, 203 F.3d 103 (1st

---

[10] The panel below did not quote the bracketed portion of the second paragraph we have included in the text. We have inserted the bracketed material to provide the full context, and content, of the controlling rule set forth by the High Court.

Cir. 2000) – decided after the trial in this case – to be persuasive, the panel stated that it would "apply the factors set forth" in Leon-Delfis to determine whether appellee had in fact waived his right to counsel for purposes of a post-polygraph interview. The court identified the four Leon-Delfis factors as: "'who requested the polygraph examination; who initiated the post-polygraph questioning; whether the signed waiver clearly specifies that it applies to post-polygraph questioning or only to the polygraph test; and whether the defendant has consulted with counsel.'" Hill, 42 A.3d at 1094, quoting Leon-Delfis, 203 F.3d at 111. The panel noted, however, that because of subsequent U.S. Supreme Court precedent, "the significance of the first two factors listed in Leon-Delfis, has essentially been negated." Id. at 1095 n.9 (citing Montejo v. Louisiana, 556 U.S. 778 (2009)). The panel then concluded, apparently as a matter of law based on its application of the Leon-Delfis factors, that appellee did not waive his right to counsel for purposes of the post-polygraph interview. 42 A.3d at 1095-97.

More specifically, the panel majority emphasized that appellee's written Miranda waiver had been lost by the time of the PCRA hearing, and thus there was no "conclusive answer" of whether that document addressed the post-polygraph period. However, the court added, neither Detective Kelly nor Detective Steenson had affirmatively testified at the PCRA hearing that appellee was "specifically advised that the requested waiver also applied to post-polygraph examinations." Id. at 1095. The court next stressed that the post-polygraph interview by Detective Kelly was performed by a different law enforcement officer than the officer who conducted the polygraph. Finally, adverting to the final Leon-Delfis factor, the court noted that although appellee had consulted with counsel prior to the polygraph, there was no additional consultation prior to the post-polygraph interview. The panel also stressed that, although counsel

understood that a post-polygraph interview could be part of the process, counsel did not testify at the PCRA hearing that he conveyed this fact to appellee. Id. at 1096.

The panel majority next dismissed as "error" the PCRA court's finding that Detective Kelly's post-polygraph interview of appellee was "part of the polygraph process." The panel stated that counsel "established the scope of [appellee's] waiver" by participating in drafting the questions to be asked during the polygraph examination. The panel further declared that: "In advising [appellee] to go downstairs with Detective Steenson to take the polygraph examination and to tell the truth while doing so, [counsel's] clear message to [appellee] was that it was acceptable to answer the polygraph questions without his lawyer present – in part because his lawyer had approved the questions to be asked." Id. at 1096-97.

The panel majority then concluded that appellee did not waive counsel for purposes of the post-polygraph interview, finding that the absence of a specific explanation that his waiver embraced post-polygraph questioning rendered the waiver invalid, apparently as a matter of law. The panel opined that the scope of a Miranda waiver is based upon what the defendant understands at the time of his waiver. According to the court, a valid Miranda waiver for a post-polygraph interview requires proof that the defendant "was aware that he was waiving such a right and that he understood the risks associated with its forfeiture." In the panel's view, the record "contain[ed] no evidence" that appellee knew that post-polygraph questioning would occur, or that his earlier waiver was "likewise" a waiver of counsel for post-polygraph questioning. The panel then concluded its analysis of the underlying issue by declaring that "the Commonwealth failed to satisfy its burden of proof that [appellee] knowingly and intelligently waived his Sixth Amendment right to counsel." Id. at 1097

The panel majority then turned to and disposed of the actual collateral claim before it – counsel's alleged ineffectiveness – in a single paragraph. Because the waiver of counsel was invalid, the panel stated, appellee's foregone suppression claim concerning the statement to Detective Kelly had merit. The panel did not address trial counsel's proffered reasons for not moving to suppress. Instead, the court's remaining analysis consisted of a declaration that counsel acted unreasonably, followed by a non-record-based assessment of prejudice:

> We likewise conclude that [trial counsel] had no reasonable basis for his actions, and that his failure to suppress [sic] [appellee]'s statement was highly prejudicial. In this regard, the PCRA court found [appellee]'s statements during the post-polygraph interrogation, when introduced by Lieutenant Kelly at trial, were incriminating. Trial Court Opinion, 1/2/07, at 4 (finding number 12). Echoing this position, at the conclusion of the PCRA evidentiary hearings, counsel for the Commonwealth conceded that the scope of [appellee]'s waiver of his constitutional right to counsel was the only genuine issue for the PCRA court's resolution, since without [appellee]'s post-polygraph incriminating statement to Lieutenant Kelly "we are – we are basically out of court. [Appellee] would be entitled to a new trial which perhaps we couldn't even give him."

Id. at 1097 (PCRA transcript citation omitted).

Although the panel majority had earlier recognized that appellee made two post-polygraph statements – a written statement to Detective Steenson and an oral statement to Detective Kelly – the panel did not separately analyze the statement to Detective Steenson, and its holding was tied exclusively to the circumstances surrounding the statement to Detective Kelly (including that he was not the officer who had administered the polygraph).

In a dissenting opinion, Judge Jack Panella disagreed with the panel majority's conclusion that the post-polygraph interview constituted a new interrogation that

exceeded the scope of appellee's explicit waiver of rights. In the dissent's view (which was consistent with the understanding of trial counsel), the post-polygraph interview was part and parcel of the polygraph process, and appellee had knowingly and voluntarily waived his right to counsel for strategic reasons. The dissent adverted to Wyrick, noting that the High Court had held that a new set of Miranda warnings was not required before a post-polygraph interview, as well as the Wyrick Court's emphasis that "'it would have been unreasonable for *Fields and his attorneys* to assume that Fields would not be informed of the polygraph readings and asked to explain any unfavorable result.'" 42 A.3d at 1098 (Panella, J., dissenting) (emphasis supplied in dissenting opinion), quoting Wyrick, 459 U.S. at 47. The dissent also stressed that appellee had made no request for counsel after the polygraph examination and after being told he had failed the test. In the dissent's view, the case involved "an undisputed waiver combined with actions of trial counsel that were knowledgeable, voluntary, and performed for tactical reasons." Id. at 1100. Hence, the dissent would have affirmed the denial of relief on this claim. The panel majority did not respond to the dissent's focus upon trial counsel's proffered explanation for his conduct.[11]

---

[11] The parties and the courts below appear not to have recognized the import of the fact that appellee was represented by new counsel on direct appeal and raised claims of ineffective assistance of counsel on that appeal, as was his right at that time. See Commonwealth v. Grant, 813 A.2d 726 (Pa. 2002). Thus, the proper cognizable claim under the PCRA was a "layered" claim of ineffectiveness, focusing on appellate counsel's failure to allege trial counsel's ineffectiveness for failing to move to suppress appellee's statement. See, e.g., Commonwealth v. McGill, 832 A.2d 1014 (Pa. 2003). The Commonwealth has not pressed this point, it was not the PCRA court's ground for decision (had it been, appellee could have sought leave to amend his pleadings to address appellate counsel's performance), and in any event, the question of layering is not encompassed in our grant of review.

## II.

The Commonwealth presents the following issue, which it identifies as one of first impression in Pennsylvania:

> Is a second set of Miranda warnings and a second waiver required before questioning a criminal defendant immediately after he failed a polygraph examination and waived his right to remain silent after being read Miranda warnings right before the polygraph examination?

We note at the outset that the characterization of the issue as one of first impression is overstated, since the claim arises under the PCRA and sounds in counsel ineffectiveness under Strickland v. Washington, 466 U.S. 668 (1984). Thus, we do not consider the unadorned question of where the U.S. Supreme Court might progress in terms of Miranda waivers and post-polygraph interviews, for example, or trends and decisions in this area post-dating appellee's 1998 trial. Rather, the contemporaneous assessment requirement of Strickland directs courts to focus on counsel's conduct, as measured by the governing law in existence in 1998. Commonwealth v. Colavita, 993 A.2d 874, 895 (Pa. 2010) ("The ultimate focus of an ineffectiveness inquiry is always upon counsel, and not upon an alleged deficiency in the abstract."). With this caveat, we proceed to the parties' arguments.

The Commonwealth argues that appellee's waiver of his Miranda rights allowed police to conduct the polygraph examination appellee had requested through counsel, including the questioning that immediately followed his failure of the examination. The Commonwealth posits that the post-polygraph questioning was part of the same interview as the polygraph examination to which appellee expressly assented, and absent some substantial change in circumstances not present here, the police could lawfully continue to question appellee without securing a second Miranda waiver –

particularly because appellee did not invoke his right to silence or his right to counsel, despite his awareness of those rights.

The Commonwealth further claims that the U.S. Supreme Court analyzed "the precise issue" in Wyrick v. Fields because in that case, as here, the dispute centered on the admissibility of a statement given after a government polygraph examination requested by the defendant's attorney. The Commonwealth stresses that the Wyrick Court held that a defense request for a polygraph examination amounts to the defendant himself initiating interrogation: "'That is, [the defendant] waived not only his right to be free of contact with the authorities in the absence of an attorney, but also his right to be free of interrogation about the crime for which he was suspected.'" Commonwealth's Brief at 14, quoting Wyrick, 459 U.S. at 47. Further quoting from Wyrick, the Commonwealth states that, in circumstances like these, the defendant has "'validly waived his right to have counsel present at post-test questioning, unless the circumstances changed so seriously that his answers no longer were voluntary, or unless he no longer was making a knowing and intelligent relinquishment or abandonment of his rights.'" Id., quoting Wyrick, 459 U.S. at 47 (internal quotation marks omitted). The Commonwealth argues that because appellee was informed that he could stop questioning at any time, and could request that his lawyer join him, "'[m]erely disconnecting the polygraph equipment could not remove this knowledge from [appellee's] mind.'" Id. at 15, quoting Wyrick at 47-48. Thus, according to the Commonwealth, because there was no significant intervening change in appellee's circumstances other than police disconnecting the polygraph equipment, this Court should follow Wyrick and not adopt the analytical approach the First Circuit devised in 2000.

The Commonwealth also stresses that appellee's suppression claim arises in the context of ineffective assistance of counsel, and yet the Superior Court majority focused on its view of the stand-alone merit of the suppression claim "*de novo*" without holding appellee to his burden to prove counsel ineffective. The Commonwealth says that the Superior Court overlooked that it was supposed to "'begin with the presumption that counsel rendered effective assistance,'" and indeed, failed to focus on counsel at all. Commonwealth's Brief at 18, quoting Commonwealth v. Dennis, 17 A.3d 297, 301 (Pa. 2011). The Commonwealth notes that trial counsel was an experienced criminal defense attorney; that he expected that post-polygraph questioning would occur; that counsel reasonably relied upon his client's insistence that he was not involved in the home invasion in recommending that he agree to the polygraph interview; and that appellee's later inconsistent statements were a product of his misrepresentations to his attorney, and not police misconduct. Id. at 16.

The Commonwealth further notes that the panel majority failed to appreciate that the First Circuit decision in Leon-Delfis that it adopted was not issued until February 16, 2000, eleven months after appellee was sentenced. The panel thereby engaged in the sort of hindsight focus not permitted by the contemporaneous assessment required to properly analyze a claim of ineffective assistance. "An attorney cannot be deemed ineffective for failing to anticipate a change or development in the law." Id. at 19, quoting Commonwealth v. Carson, 913 A.2d 220, 274 (Pa. 2006). Because Wyrick was the definitive law at the time of trial, the Commonwealth submits, counsel acted reasonably in not seeking suppression of appellee's April 25th statement to Detective Kelly, particularly given appellee's express waiver of his rights immediately prior to the police questioning represented by the polygraph. To make matters worse, the Commonwealth continues, the court applied all four prongs of the Leon-Delfis test

despite recognizing that two of the prongs were called into question by later decisional law from the U.S. Supreme Court; and the court construed the absence of the waiver form as a factor weighing against the Commonwealth as a failure of proof, even though the burden was on appellee to prove counsel ineffective.

Rather than applying the Leon-Delfis factors, the Commonwealth submits that the "more significant question" is whether there was a substantial break in the questioning between administration of the polygraph examination and the subsequent questioning. This is so, the Commonwealth argues, because a repetition of Miranda warnings is necessary only where initial warnings "have become stale or remote," with the "essential question" being whether there was a continuity of interrogation. Id. at 17, citing, *inter alia*, Commonwealth v. Scott, 752 A.2d 871, 875 (Pa. 2000). Here, the Commonwealth submits, the PCRA court found that the pre- and post-polygraph interviews were part of the polygraph process; there plainly was a continuity of questioning; and appellee never invoked his right to counsel or his right to silence.[12]

In arguing for affirmance, appellee stresses the importance of the right to counsel once adversarial proceedings have begun and the requirement of an express waiver before questioning can be conducted without counsel. Appellee recognizes, however, that he has the burden to rebut the presumption of counsel effectiveness and to prove that counsel was constitutionally deficient in failing to move to suppress. Appellee submits that he has met this burden.

---

[12] The Pennsylvania District Attorneys Association has filed an *Amicus Curiae* brief in support of the Commonwealth. The Association echoes the Commonwealth's argument, stressing that Wyrick found, under similar circumstances, that a pre-polygraph Miranda waiver extended to the post-polygraph interview, this Court has never required that Miranda warnings be reissued every time questioning is renewed as long as there is a clear continuity of interrogation, and there was a clear continuity of interrogation in this case.

Arguing the three-prong rubric for assessing Strickland's Sixth Amendment performance and prejudice paradigm, as first announced by this Court in Commonwealth v. Pierce, 527 A.2d 973 (Pa. 1987),[13] appellee first argues that a meritorious motion to suppress his April 25th statement was available because his subjective understanding was that his waiver of counsel was limited to the polygraph examination. Appellee claims that his attorney limited the scope of his waiver by jointly drafting the polygraph questions. Appellee notes that Detective Kelly's post-polygraph interview did not proceed along the lines of the questioning agreed upon, but rather was "an adversarial exchange aimed at gathering evidence" for a formal prosecution. Appellee maintains that a valid waiver must reflect a full awareness of the nature of the right being abandoned and the consequences of the waiver. Appellee then disputes the Commonwealth's assertion that the Wyrick decision is controlling, noting that the rule emerging from that case requires consideration of the totality of the circumstances.[14]

Appellee stresses that his attorney's recognition that a post-polygraph interview could occur does not define appellee's waiver and understanding, and that the record does not support that he waived his rights beyond the duration of the polygraph examination itself. Appellee argues that Wyrick is distinguishable because there was a break between his post-polygraph written statement to Detective Steenson, and his post-polygraph interview with Detective Kelly. Although appellee does not address the significance of his PCRA testimony that this break was only fifteen minutes in

[13] Under Pierce, the performance aspect of Strickland is broken into two parts, the first examining whether the claim lodged against counsel possesses "arguable merit," and the second examining whether counsel's actions were supported by a "reasonable basis." See, e.g., Commonwealth v. Robinson, 82 A.3d 998, 1005 (Pa. 2013).

[14] Appellee refers to Wyrick as a "plurality opinion." In fact, Wyrick was a precedential opinion, albeit an unsigned one, supported by eight of the nine members of the Court.

approximate duration, N.T., 4/25/06, at 90, he does contend that during this time he was not re-Mirandized and no spontaneous effort was made by police to contact his counsel. Citing Leon-Delfis, appellee argues that police initiated the post-polygraph examination without first securing an additional, explicit waiver of rights. Appellee also argues that the failure of the Commonwealth to produce a signed waiver form that raised the possibility of post-polygraph questioning "strongly supports" his claim. Appellee alleges that the police took advantage of his youth and naiveté by questioning him, and took advantage of his counsel's distinct ineffectiveness in "abandoning" him. Appellee concludes that Detective Kelly's post-polygraph interrogation violated his right to counsel, providing a basis for forwarding a meritorious suppression claim.

Appellee then argues that there was no reasonable basis to excuse his counsel's failure to move to suppress. First, appellee states that counsel's lapse was a product of an erroneous failure to perceive the merit in the motion. Appellee notes that counsel had nothing to lose by moving for suppression, and states that counsel cannot have had a reasonable basis for his action. In appellee's view, "the Latin phrase *res ipsa loquitur* is fitting" to describe why counsel "could not possibly have had" a reasonable basis for his conduct.

Turning to the Strickland requirement of actual prejudice, appellee contends that his post-polygraph statement to Detective Kelly effectively conceded his involvement in the crime and allowed the jury to see that he had contradicted himself numerous times. Appellee, like the Superior Court panel majority, also cites to the Commonwealth's statement at the PCRA hearing which, he implies, conceded Strickland prejudice.

**III.**

The Superior Court's task in reviewing the denial of PCRA relief was to determine whether the PCRA court's factual findings were supported by the record, and

whether the court's legal decision was free from error. <u>Commonwealth v. Lesko</u>, 15 A.3d 345 (Pa. 2011). In overturning the denial of PCRA relief here, the panel majority essentially held, as a matter of law, that appellee's explicit waiver of counsel was limited to the questioning by the polygraph examiner, and that, for the subsequent questioning of appellee by Detective Kelly to be valid, either the waiver had to explicitly disclose the prospect of that questioning, or the detective had to secure a second express waiver of counsel. The panel majority further held, in summary fashion, that trial counsel could not possibly have had a reasonable basis for failing to file a motion to suppress – indeed, the court did not even discuss counsel's PCRA testimony – and that appellee was prejudiced. Our review of the Superior Court's legal conclusions is plenary and *de novo*. <u>See</u> <u>Commonwealth v. Mallory</u>, 941 A.2d 686 (Pa. 2008), <u>cert.</u> <u>denied</u>, 555 U.S. 884 (2008).

In our description of the procedural history and the parties' arguments, we have noted certain legal precepts governing review of <u>Strickland</u> claims. To properly frame our discussion below, an emphasis on certain principles is appropriate. First, as the U.S. Supreme Court has recently emphasized, <u>Strickland</u> establishes a "strong presumption" that counsel was effective: "We have said that counsel should be 'strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment,' <u>Strickland</u>, 466 U.S. at 690, and that the burden to 'show that counsel's performance was deficient' rests squarely on the defendant, <u>id.</u>, at 687." <u>Burt v. Titlow</u>, ___ U.S. ___ , ___ 134 S.Ct. 10, 17 (2013). <u>Accord</u> <u>Cullen v. Pinholster</u>, ___ U.S. ___, ___, 131 S.Ct. 1388, 1404, 1407 (2011). "It should go without saying that the mere absence of evidence cannot overcome" <u>Strickland</u>'s strong presumption. <u>Burt</u>, <u>supra</u>. The reasonableness of counsel's conduct, moreover, is objectively measured, <u>Cullen</u>, 131 S.Ct. at 1407, citing <u>Harrington v.</u>

Richter, 562 U.S. 86, ___ , 131 S.Ct. 770, 791 (2011), and, the High Court has repeatedly stressed, "'[s]urmounting Strickland's high bar is never an easy task.'" Cullen, 131 S.Ct. at 1408, quoting Richter, 562 U.S. at ___, 131 S.Ct. at 788 (further citation omitted).

Second, review of counsel's conduct cannot indulge "the distorting effects of hindsight," but instead, counsel's performance must be judged in light of the circumstances as they would have appeared to counsel at the time. Strickland, 466 U.S. at 689. See also Rompilla v. Beard, 545 U.S. 374, 381 (2005) (citation omitted); Commonwealth v. Spotz, 896 A.2d 1191, 1238 (Pa. 2006) ("it is well established that the effectiveness of counsel is examined under the standards existing at the time of performance."); Commonwealth v. Gribble, 863 A.2d 455, 464 (Pa. 2004) ("Counsel cannot be deemed ineffective for failing to predict developments or changes in the law.").

The Superior Court's review in this case was deficient in several respects. The first deficiency consisted of an apparent failure to consider the trial record. This lapse is not entirely the fault of the panel, since the parties and the PCRA court likewise focused on the PCRA hearing record. Still, it is a curious collective lapse since appellee's statements obviously were introduced at trial, and it would be strange if there had been no testimony concerning the circumstances surrounding the statements. Moreover, responsible appellate briefing and judging should include a mastery of all potentially relevant parts of a record. In any event, the fact remains that the record contains the trial transcript, and that transcript contains sworn testimony directly relevant to the claim presented on collateral attack, including: (1) the precise language of appellee's pre-polygraph waiver; (2) testimony from Detective Kelly that, before conducting the post-polygraph interview, he told appellee that he was aware that appellee had been

apprised of his <u>Miranda</u> rights, and appellee indicated he indeed was aware of those rights; and (3) appellee's sworn testimony that, at the time Detective Kelly interviewed him, he knew he had the right to stop the questioning at any time. Of course, appellee, who bore the burden in forwarding his claim, could have disputed the trial account, including his own testimony. But, the trial testimony should have been accounted for in rendering a judgment here; instead, it appears, the testimony was not considered by either court below.

The second lapse concerns the panel majority's failure to acknowledge the strong presumption of effectiveness and, correspondingly, to hold appellee to his burden of proving counsel ineffective. This lapse revealed itself in several respects, including: the failure to consider trial counsel's testimony and thus to assess the claim from counsel's perspective; and drawing an inference against the Commonwealth based upon (an erroneously assumed) absence of evidence in the record concerning the precise contours of appellee's waiver of rights on April 25, 1998, and culminating in the court's erroneous legal conclusion that the Commonwealth "failed to satisfy its burden of proof" respecting appellee's waiver.

Third, the panel majority failed to assess counsel's performance based upon the governing law in existence when counsel was alleged to have acted ineffectively – *i.e.*, in 1998. The panel conducted a survey of how other courts – in particular, federal courts of appeals – had approached the issue under what the panel correctly recognized was the leading case, <u>Wyrick v. Fields</u>, and ultimately adopted a four-factor test set forth by the First Circuit in its 2000 decision in <u>U.S. v. Leon-Delfis</u> (notwithstanding that two of those factors were of questionable legitimacy). Of course, such surveys of the legal landscape can be an appropriate way to assess what arguments were reasonably available to diligent defense counsel. But, the panel went

astray to the extent it measured counsel's conduct according to a standard from a case that did not exist at the time counsel acted.[15] Whatever virtue the First Circuit case might have as an abstract matter, it was an inappropriate measure of counsel's conduct in 1998. We specifically disapprove of the panel's adoption of the Leon-Delfis test – while offering no view on the best way to approach Wyrick waivers in a direct review context – because this collateral review matter is an inappropriate vehicle to make that determination. The focus is on counsel, in 1998.

In addition to, or perhaps deriving from, these primary difficulties, it appears that the panel majority gave insufficient heed to the High Court's teaching in Wyrick. The Commonwealth highlights the Wyrick Court's emphasis on the significance of a defense-initiated request for a polygraph examination, which waives "not only his right to be free of contact with the authorities in the absence of an attorney, but also his right to be free of interrogation about the crime for which he was suspected," as well as the Court's teaching that the waiver remains valid "unless the circumstances changed so seriously that his answers no longer were voluntary, or unless he no longer was making a knowing and intelligent relinquishment or abandonment of his rights." Wyrick, 459 U.S. at 47.[16] The Wyrick Court also stressed: (1) that it would be unreasonable for a

---

[15] The panel majority noted that it was "persuaded" to adopt the reasoning in Leon-Delfis "particularly" because the First Circuit had surveyed cases in other Circuits construing Wyrick v. Fields. 42 A.3d at 1095 n.8. To be sure, certain of the decisions surveyed in Leon-Delfis were in existence in 1998. See, e.g., U.S. v. Johnson, 816 F.2d 918 (3d Cir. 1987); U.S. v. Gillyard, 726 F.2d 1426 (9th Cir. 1984). However, no suggestion was made in the panel majority opinion below, or in the presentations here, that the Leon-Delfis test itself represented the prevailing approach to cases implicating Wyrick v. Fields in the federal or Pennsylvania legal community in 1998.

[16] The panel majority below noted that it was unclear whether the defense had requested the polygraph and the PCRA court had made no specific finding on the point. 42 A.3d at 1095. But, as the Commonwealth noted in its brief, the burden was on appellee to prove his claim, and the absence of proof does not suffice. (…continued)

defendant and his attorney to assume that there would be no questioning after a polygraph examination; (2) the significance of a defendant acknowledging that he understood his rights, which include the right to end police questioning and to request the presence of a lawyer ("Merely disconnecting the polygraph equipment could not remove this knowledge," id. at 47); and (3) that it is illogical to assume that questioning after a polygraph examination will cause a defendant to forget rights he acknowledged and understood a short time before.

Thus, there is force in the Commonwealth's argument that the panel should have focused on factors such as the continuity of the interrogation on April 25th, a circumstance dispelling concerns of the staleness of the warnings, and the fact that, despite being expressly made aware of his rights (including the "right to have an attorney present to speak with before and during questioning if you so desire" (supra, at 9)), and acknowledging that he understood those rights, appellee never invoked them.

The panel's assessment of Strickland prejudice also was problematic. The court had before it a PCRA court judgment denying relief on the claim without reaching prejudice, which was an acceptable manner of resolving a Strickland claim. Lesko, 15 A.3d 345, 374 (Pa. 2011) ("Both the U.S. Supreme Court and this Court have made clear that a court is not required to analyze the elements of an ineffectiveness claim in any particular order of priority; instead, if a claim fails under any necessary element of the Strickland test, the court may proceed to that element first.") (citing Strickland and

_____

(continued…)
Commonwealth's Brief at 18-19. Moreover, from trial counsel's PCRA testimony, it is evident that counsel thought the Commonwealth's willingness to administer the polygraph was a positive development, and he encouraged appellee to submit to the examination. Regardless of which side first mentioned the test, the record proves appellee's express agreement to a procedure that necessarily waived both his right to silence and to counsel.

Commonwealth v. Albrecht, 720 A.2d 693, 701 (Pa. 1998)).  To overturn that judgment, however, the panel had to make a finding of prejudice, since the Commonwealth had prevailed below.  Under Strickland, the defendant has to show a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different.  See, e.g., Strickland, 466 U.S. at 694; Commonwealth v. Sepulveda, 55 A.3d 1108 (Pa. 2012).  "[A] reasonable probability is a probability that is sufficient to undermine confidence in the outcome of the proceeding."  Commonwealth v. Spotz, 84 A.3d 294, 312 (Pa. 2014) (citations omitted); see also Strickland, 466 U.S. at 694.  This Court has cautioned that, in cases where prejudice is not self-evident, and the PCRA court did not pass upon the prejudice element, a remand may be appropriate.  Sepulveda, 55 A.3d at 1131; accord Hinton v. Alabama, ___ U.S. ___, 134 S.Ct. 1081 (2014) (remanding for reconsideration of whether a deficient performance of counsel was prejudicial under Strickland, where no court had evaluated prejudice by applying proper inquiry to the relevant facts).

The panel majority below did not look to the trial evidence and assess the actual harmful effect of the introduction of appellee's post-polygraph statement to Detective Kelly.  In this regard, we note that the matter does not appear to be so simple, given that appellee's other statements to police (including his first post-polygraph statement to Detective Steenson) became evidence, and appellee himself testified, and in a manner that was not inconsistent, at its core, with his accounts to police.  The issue also appears to implicate trial counsel's PCRA testimony that he did not view appellee's statements, as a whole, to be particularly harmful to appellee's case.[17]

---

[17] There is some superficial force to appellee's argument that counsel had nothing to lose in filing a motion to suppress, but decisions along these lines can include strategic elements, particularly in a case where counsel believes that his client is credible and (…continued)

Rather than assess the actual trial circumstances, and counsel's explanation, the panel majority simply adverted to what it deemed to be an apparent PCRA hearing concession by the Commonwealth. Of course, it is up to the Commonwealth to determine its appropriate litigation stance. But, in this case, the Commonwealth prevailed at the hearing level, it was the PCRA court's **judgment** that was under review in the Superior Court, and appellee bore the burden. The panel majority's approach, under the circumstances, was too facile.

For all of these reasons, it is obvious that the Superior Court's decision cannot stand on its terms. What remains to determine is whether appellee's claim of ineffectiveness, properly assessed, entitles him to relief on grounds that trial counsel was ineffective in failing to file a motion to suppress. In our view, this is a matter better determined by the Superior Court in the first instance, following relevant additional briefing. The claim as presented in this Court has complications not appreciated by the parties or the courts below – specifically, the relevant trial evidence concerning appellee's waiver and his post-polygraph interview with Detective Kelly. The interrelationship of that evidence with the PCRA hearing testimony is a matter that should be addressed prior to an ultimate decision. We recognize that we could simply ignore the trial testimony, as the lower courts and the parties have, and assess appellee's claim upon a diminished record. But, we do not regard this as the optimal practice, particularly where it appears that central points appellee testified to under oath, at different proceedings, are in tension, and no factual finding has been made to resolve the tension. In addition, we note, the Superior Court did not address appellee's second claim, involving his April 21st statement, nor did it assess his post-polygraph statement

---

(continued…)

should testify. We offer no ultimate view on the notion here; the point is that the case presents apparent nuances not appreciated by the panel majority.

to Detective Steenson; the content and admissibility of those statements could affect an appropriate prejudice assessment. Accordingly, we will vacate the order and judgment of the Superior Court and remand to that court to consider appellee's claim anew, consistently with the guidance in this Opinion, and to pass upon appellee's remaining claim.

Vacated and remanded to the Superior Court for further consideration consistently with this Opinion. Jurisdiction is relinquished.

Mr. Justice Baer, Madame Justice Todd and Mr. Justice Stevens join the opinion.

Mr. Justice Saylor files a concurring opinion.

Mr. Justice Eakin files a concurring opinion.