J-S53015-15

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P 65.37**

COMMONWEALTH OF PENNSYLVANIA, : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
Appellee :
:
v. :
:
ERIC DAVID WEAVER, :
:
Appellant : No. 109 MDA 2015

Appeal from the Judgment of Sentence August 20, 2014,
Court of Common Pleas, Lebanon County,
Criminal Division at No. CP-38-CR-0000827-2013

BEFORE: DONOHUE, OTT and MUSMANNO, JJ.

MEMORANDUM BY DONOHUE, J.: **FILED OCTOBER 09, 2015**

Eric David Weaver ("Weaver") appeals from the August 20, 2014 judgment of sentence entered by the Lebanon County Court of Common Pleas following his conviction of attempted sexual assault.[1]  Upon review, we affirm.

On April 12, 2013, Weaver worked at a horse rescue and rehabilitation facility in Bernville, Pennsylvania with the twenty-year-old victim.  N.T., 4/9/14, at 4-5.  It was a rainy day, and the owner of the business instructed the employees to take a long lunch and return to work around 3:00 p.m. *Id.* at 7.  Weaver invited the victim to have lunch with him at his apartment, and she accepted.  *Id.*  According to the victim, she regularly had lunch with Weaver with or without her other coworkers, but she had never previously

---
[1]  18 Pa.C.S.A. §§ 901(a), 3124.1.

been to his apartment. *Id.* at 7-8. They drove to Weaver's apartment together in Weaver's vehicle. *Id.* at 8.

At the apartment, the victim removed her shoes and one of the two sweatshirts she was wearing at the time. *Id.* at 9. They watched television, chatted and ate soup for lunch. *Id.* at 9. After she finished eating, the victim went into the kitchen to throw away her trash. *Id.* Weaver then began pushing her into the bedroom. *Id.* at 9-10. She questioned what he was doing, and in response, Weaver instructed her to "just relax." *Id.* at 10. According to the victim, Weaver pushed her onto the bed in his bedroom, disrobed, and then removed her clothing. *Id.* at 11-12. She recalled being paralyzed with fear and unable to leave the room or to tell him to stop. *Id.* at 12. Weaver climbed onto the victim and laid on top of her, telling her that she is "so gorgeous," and that he was "going to fuck [her] brains out." *Id.* at 12-13. He touched and kissed her lips and cheeks, kissed, licked and sucked her breasts, digitally penetrated her vagina, and performed oral sex on the victim. *Id.* at 13-15. While this was occurring, the victim stated that she wanted to leave, but she was unable to get herself to move. *Id.* at 15. Finally, when Weaver began trying to penetrate her vagina with his penis, the victim was able to move herself and tried to push him off of her. *Id.* She told Weaver "no" and that she did not want to have sex with him, but he again told her to "just relax." *Id.* at 15-16. In an attempt to stop the assault, the victim stated that she offered to "give him

[] a hand job or anything to make him stop," but that Weaver declined. *Id.* at 16.

According to the victim, there was no discussion about the two engaging in sexual activity prior to the assault, and other than her offer to "give [Weaver] a hand job," the victim did not reciprocate in any way or engage in any of the sex acts with Weaver. *Id.* at 18. After the assault, the victim got back into Weaver's car and the two returned to work, where they finished their day. *Id.* at 19. Upon leaving for the day, the victim never returned to work at the horse rescue and rehabilitation facility. *Id.*

That night, the victim telephoned her mother and asked to move back into her parents' house from the apartment to which she had recently moved. *Id.* at 19-20, 60. The day after that, the victim's mother observed that she seemed depressed and was not eating. *Id.* at 61. Concerned because of the victim's history of suffering from an eating disorder, she took the victim to Hershey Medical Center and then to Belmont Behavioral Hospital ("Belmont") in Philadelphia for treatment. *Id.* at 62.

While speaking with a counselor at Belmont, the victim disclosed for the first time that Weaver had sexually assaulted her. *Id.* at 20. The counselor reported the assault to the Philadelphia Police Department, which referred the case to the Pennsylvania State Police because the incident occurred in Lebanon County. *Id.* at 68. The victim had reported that the perpetrator was "Eric Cruz," and Trooper Nathan Trate began his

investigation on May 3, 2013 by calling the victim's place of employment to obtain the alleged perpetrator's contact information. *Id.* The owner gave Trooper Trate Weaver's cellphone number, who returned Trooper Trate's message within two hours of his call. *Id.* at 69, 71-72. Although Weaver denied that he was Eric Cruz or that he knew an Eric Cruz, he admitted that he knew the victim and that he worked at the horse rescue and rehabilitation facility. *Id.* at 72. Weaver agreed to come in to speak with Trooper Trate, and ultimately did so on May 7, 2013. *Id.* at 73.

In the meantime, Trooper Trate met with the victim on May 4, 2013. *Id.* at 69. He described her as "distraught," "very[,] very upset," and observed her to be "shaking a little bit." *Id.* at 69, 70. She was able to provide some details of the assault, but it was difficult for her to verbalize what happened, at times sitting silently for five minutes before answering a general question posed by the trooper. *Id.* at 70. Trooper Trate instead provided her with a written statement form, which the victim took home and returned to him several days later, at which time the trooper was able to ask her follow up questions. *Id.* at 70-71, 100.

When Weaver met with Trooper Trate on May 7, he informed the trooper that he was adopted and that he does sometimes go by Eric Cruz, as Cruz is his biological father's last name. *Id.* at 76. After questioning Weaver as to why he denied that identity when they spoke on the phone, Trooper Trate uttered a date – April 24, 2013 (the date of the Philadelphia

Police Department's report) – following which Weaver began to ramble on about the sexual encounter he had with the victim. *Id.* at 77-80. Weaver acknowledged that he had sexual contact with the victim at his apartment, but stated that it was consensual. *Id.* at 78-79. He contended that it all began while they were still at work, with the victim hugging and kissing him, and that she requested to go to Weaver's apartment, as she was looking for an apartment and was contemplating moving in with him. *Id.* at 79, 84, 91. Weaver said that at the apartment, they "messed around a little bit," meaning that they were "making out," and that the victim agreed to accompany Weaver into his bedroom. *Id.* at 79-80. Weaver stated that the victim told him she did not want to have intercourse because she was not taking birth control pills, but Weaver later told Trooper Trate that the victim did not want to have sex because "she is a Christian." *Id.* at 86-87. Weaver said that the victim offered to perform oral sex on him, but that he declined. *Id.* at 80. Weaver stated that he respected the victim's wishes and did not pursue intercourse with her. *Id.* at 86, 90.

At the conclusion of the May 7 interview, Weaver agreed to come back in to take a polygraph examination, which occurred on May 20. *Id.* at 95-96.[2] Trooper Wesley John LeVan, II, conducted the examination and the pre- and post-examination interviews. *Id.* at 123. Following the polygraph

_____

[2] The jury was not made aware that Weaver participated in a polygraph examination or the results thereof.

examination, Trooper LeVan informed Weaver that he failed and he began interrogating Weaver. *Id.* at 130. Trooper LeVan asked Weaver if he attempted to put his penis inside the victim's vagina, and Weaver initially denied that he did this. *Id.* at 131-32. He subsequently admitted that "[h]e tried to poke it into her vagina a couple times" while they were "spooning," but that the victim put her hand down to stop him from penetrating her vagina. *Id.* at 132. Weaver ultimately confessed to crawling down to the end of the bed, spreading the victim's legs, and trying to penetrate her vagina with his penis even though he knew the victim "was not into this," "she kept backing away," and he "felt like he took advantage of her." *Id.* at 132, 134-36. Weaver stated that he knew he should have stopped, but "his hormones weren't allowing him to stop[.]" *Id.* at 135. He further admitted that the victim did not request to perform oral sex on Weaver, but that Weaver "asked her for it … [and] [s]he said no." *Id.* at 137.

The Commonwealth charged Weaver with attempted rape, involuntary deviate sexual intercourse, sexual assault, attempted sexual assault, and two counts each of aggravated indecent assault and indecent assault.[3] On August 16, 2013, Weaver filed an omnibus pretrial motion seeking suppression of the statements he made to the police on May 7 and May 20,

---

[3] 18 Pa.C.S.A. §§ 901, 3121(a)(1), 3123(a)(1), 3124.1, 3125(a)(1)-(2), 3126(a)(1)-(2).

2013. The trial court held a hearing on the motion on October 2, 2013. On January 20, 2014, the trial court issued an order denying the motion.

A jury trial convened on April 9, 2014, following which the jury acquitted Weaver of all charges other than attempted sexual assault. The trial court sentenced Weaver to five to ten years of imprisonment on August 20, 2014. He filed a timely post-sentence motion on September 2, 2014, challenging the trial court's denial of his pretrial motion and the sufficiency and weight of the evidence to support his conviction. The trial court denied the motion on December 12, 2014.

Weaver filed a timely notice of appeal and complied with the trial court's order for the filing of a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). He raises the following issues for our review, which we reordered for ease of disposition:

I.  Should [Weaver]'s [m]otion for [j]udgment of [a]cquittal be granted because the Commonwealth failed to present sufficient evidence at trial to prove beyond a reasonable doubt that [Weaver] attempted to engage in non-consensual sexual intercourse with the [v]ictim?

II.  Should [Weaver]'s [m]otion for a [n]ew [t]rial be granted because the jury placed too great a weight on the testimony of the [v]ictim [] [?]

III.  Should [Weaver]'s [m]otion for a [n]ew [t]rial be granted because the [t]rial [c]ourt erred by denying [Weaver]'s [o]mnibus [p]retrial [m]otion to [s]uppress [Weaver]'s statements to Trooper Trate and Trooper Le[V]an because [Weaver] was subject to a custodial interrogation without being advised of

[]his [*Miranda*[4]] rights, and [Weaver]'s statements were not given freely and voluntarily[?]

Weaver's Brief at 4.

We begin with Weaver's first issue, which challenges the sufficiency of the evidence to support his conviction. "Whether sufficient evidence exists to support the verdict is a question of law; our standard of review is de novo and our scope of review is plenary." *Commonwealth v. Tejada*, 107 A.3d 788, 792 (Pa. Super. 2015) (citation omitted).

> We review the evidence in the light most favorable to the verdict winner to determine whether there is sufficient evidence to allow the jury to find every element of a crime beyond a reasonable doubt.
>
> In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the finder of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

---

[4] *Miranda v. Arizona*, 384 U.S. 436 (1966).

*Id.* (citations omitted).

The Pennsylvania Crimes Code defines sexual assault as follows: "[A] person commits a felony of the second degree when that person engages in sexual intercourse or deviate sexual intercourse with a complainant without the complainant's consent." 18 Pa.C.S.A. § 3124.1. "A person commits an attempt when, with intent to commit a specific crime, he does any act which constitutes a substantial step toward the commission of that crime." 18 Pa.C.S.A. § 901(a). Thus, to convict Weaver of attempted sexual assault, the Commonwealth was required to prove (1) Weaver intended to engage in sexual intercourse with the victim; (2) without the victim's consent; and (3) Weaver took a substantial step towards engaging in sexual intercourse with the victim without her consent.

Weaver contends that the evidence did not sufficiently establish that he attempted to commit sexual assault because "the testimony adduced at trial clearly established that after [the victim] said 'no,' when Weaver attempted to place his penis in her vagina that ultimately Weaver did not place his penis in her vagina." Weaver's Brief at 9-10. A conviction of attempted sexual assault, however, does not require proof of penetration. *See, e.g., Commonwealth v. Pasley*, 743 A.2d 521, 524 (Pa. Super. 1999) (finding evidence sufficient to support conviction of attempted sexual assault where the defendant, "who was only wearing shorts, threw the victim on his bed, straddled her, pushed up her shirt and bra to her neck,

and attempted to unbutton her pants," during which the victim scratched and punched the defendant until he bled).

As the above summary of the evidence presented at trial reflects, the victim testified, and Weaver admitted to police, that he attempted to penetrate the victim's vagina with his penis despite the fact that the victim, through her words and her body language, indicated that she did consent to sexual intercourse. N.T., 4/9/14, at 15-16, 132, 134-36. Weaver further admitted to police that he knew the victim did not want to engage in sexual intercourse and that he knew he should have stopped, but "his hormones weren't allowing him to stop[.]" *Id.* at 135. As such, this argument does not entitle Weaver to relief.

Weaver's second issue on appeal challenges the weight of the evidence to support his conviction, which we review according to the following standard:

> A claim alleging the verdict was against the weight of the evidence is addressed to the discretion of the trial court. Accordingly, an appellate court reviews the exercise of the trial court's discretion; it does not answer for itself whether the verdict was against the weight of the evidence. It is well settled that the [jury] is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses, and a new trial based on a weight of the evidence claim is only warranted where the [jury's] verdict is so contrary to the evidence that it shocks one's sense of justice. In determining whether this standard has been met, appellate review is limited to whether the trial judge's discretion was properly exercised, and relief will only be granted where the

> facts and inferences of record disclose a palpable
> abuse of discretion.

***Tejada***, 107 A.3d at 795-96 (citation omitted).

Weaver's sole argument here is that "the [victim]'s testimony was not credible[] and the [j]ury's verdict was against the weight of the evidence in that the [j]ury placed too great a weight on [the victim]'s testimony." Weaver's Brief at 16. He does not point to any specific passage or portion of the victim's testimony that was not worthy of belief. Moreover, he completely ignores the evidence presented of his confession to the police, which corroborated the victim's testimony in support of his conviction. We therefore find no abuse of discretion in the trial court's denial of his request for a new trial on this basis.

As his final issue on appeal, Weaver asserts that the trial court erred by denying his pretrial motion to suppress the statements he gave to the police on May 7 and 20, 2013. We review this issue to determine whether the record supports the trial court's findings of fact and whether the legal conclusions drawn therefrom are correct. ***Commonwealth v. Garvin***, 50 A.3d 694, 697 (Pa. Super. 2012). We are bound by the trial court's factual findings, but not by its legal conclusions, which we review de novo. ***Id.***

Regarding his May 7 statement to police, Weaver states that Trooper Trate began questioning Weaver about the allegations and elicited "incriminating information from Weaver" prior to providing him his ***Miranda***

- 11 -

warnings during what he asserts was a custodial interrogation. Weaver's Brief at 12. The trial court found that because Weaver was not subjected to a custodial interrogation on May 7, ***Miranda*** warnings were not required. Trial Court Opinion, 1/20/14, at 7; Trial Court Opinion, 12/12/14, at 12.

The law is clear ***Miranda*** warnings must be provided to a defendant only if he is subjected to a custodial interrogation. ***Garvin***, 50 A.3d at 698. "[V]olunteered or spontaneous utterances by an individual are admissible without the administration of ***Miranda*** warnings." ***Id.*** The United States Supreme Court in ***Miranda v. Arizona*** defined "custodial interrogation" as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." ***Miranda***, 384 U.S. at 444. Our Supreme Court has stated that a finding of custody is warranted if the defendant "is physically denied his freedom of action in any significant way or is placed in a situation in which he reasonably believes that his freedom of action or movement is restricted by the interrogation." ***Commonwealth v. Cooley***, ___ A.3d ___, 2015 WL 4068720, *5 (Pa. June 15, 2015) (citation and quotation marks omitted). "The standard for determining whether an encounter is custodial is an objective one, focusing on the totality of the circumstances with due consideration given to the reasonable impression conveyed to the individual being questioned." ***Id.***

In arriving at the determination of whether the defendant was subjected to a custodial interrogation or the functional equivalent thereof, courts in this Commonwealth have identified several factors to consider: "the basis for the detention; its length; its location; whether the suspect was transported against his or her will, how far, and why; whether restraints were used; whether the law enforcement officer showed, threatened or used force; and the investigative methods employed to confirm or dispel suspicions." *Commonwealth v. Baker*, 963 A.2d 495, 501 (Pa. Super. 2008) (citation omitted). However, "[t]he fact that a police investigation has focused on a particular individual does not automatically trigger 'custody,' thus requiring *Miranda* warnings." *Id.*

The record in the case at bar reflects that on May 7, 2013, Weaver came to the Jonestown barracks to meet with Trooper Trate, having been transported there by a friend. N.T., 10/2/13, at 25. Trooper Trate was wearing a suit, not a police uniform, and did not believe he was carrying a firearm at that time. *Id.* at 26. The interview took place in a ten-by-ten room and Weaver sat directly next to the door. *Id.* at 25. Weaver was not restrained in anyway; in fact, Trooper Trate informed Weaver both before and after the interview that he was free to leave. *Id.* at 27-28. Trooper Trate made no threats or promises during the interview. *Id.* at 28.

Other than the fact that the interview took place at a police station, nothing suggests that the interview was a custodial interrogation. Thus, we

- 13 -

have no basis to conclude that a custodial interrogation occurred prior to Trooper Trate administering *Miranda* warnings to Weaver on May 7, 2013.

Turning to his May 20 statement to police, Weaver acknowledges that he waived his *Miranda* rights prior to his polygraph examination. He asserts, however, that pursuant to this Court's holding in *Commonwealth v. Hill*, 42 A.3d 1085 (Pa. Super. 2012), *vacated*, 104 A.3d 1220 (Pa. 2014),[5] and, more specifically, the case upon which it relied, *U.S. v. León–Delfis*, 203 F.3d 103 (1st Cir. 2000), which he contends is "analogous" to the case at bar, the statements made to police during and after the polygraph examination on May 20, 2013 should have been suppressed. Weaver's Brief at 13-15. The trial court found that the statements made by Weaver during the polygraph and after the polygraph examination were admissible. Trial Court Opinion, 1/20/14, at 9-10.

Our review of *León–Delfis* reveals that it is far from "analogous" to the case before us, as Weaver contends. In *León–Delfis*, the defendant was under investigation concerning his involvement in an alleged conspiracy to embezzle money while an employee of the United States Department of Veterans Affairs in Puerto Rico. *León–Delfis*, 203 F.3d at 106. Federal

---

[5] We note with disapproval that Weaver does not include any notation in his appellate brief that this Court's decision in *Hill* was reversed by our Supreme Court. Indeed, despite the fact that our Supreme Court's decision in *Hill* was authored prior to the notice of appeal in this case, neither the Commonwealth nor Weaver include any discussion regarding the reversal of this Court's decision in *Hill*.

agents requested that León–Delfis participate in a polygraph examination, and he agreed. *Id.* at 107. He signed two waiver of rights forms, neither of which included any indication that he would be subjected to post-polygraph questioning, and León–Delfis was not otherwise advised of the possibility of a post-polygraph interrogation. *Id.* at 107-08, 109. His attorney, who also was not informed that a post-polygraph interview would occur, was told the exam would take two hours, and so he returned to his office. *Id.* at 108. The exam actually took less than a half hour, following which the federal agent informed León–Delfis that he was not being honest and began interrogating him and, along with a second agent, interrogated him for an hour, at which point he confessed to his participation in the conspiracy. *Id.*

León–Delfis filed a motion to suppress his post-polygraph statement, which the district court denied. *Id.* at 108-09. On appeal, the first circuit court of appeals reversed, concluding, based on the totality of the circumstances, that "the district court erred in concluding that León–Delfis intelligently and knowingly waived his Sixth Amendment right to counsel for the post-test interrogation and that his confession was not admissible." *Id.* at 112. In so holding, the court considered "relevant facts" articulated by other federal courts examining this question, including "who requested the polygraph examination; who initiated the post-polygraph questioning; whether the signed waiver clearly specifies that it applies to post-polygraph questioning or only to the polygraph test; and whether the defendant has

consulted with counsel." *Id.* at 111 (citing *Wyrick v. Fields,* 459 U.S. 42, 47 (1982) (per curiam); *United States v. Johnson,* 816 F.2d 918, 921 n.4 (3d Cir. 1987); *United States v. Gillyard,* 726 F.2d 1426, 1427–29 (9th Cir. 1984); *United States v. Eagle Elk,* 711 F.2d 80, 82 (8th Cir. 1983)). Applying these factors to the case before it, the court found that the federal agents requested the polygraph examination and initiated the post-polygraph questioning and that León–Delfis had counsel and was never informed about the possibility of post-polygraph questioning such that he could waive his right to counsel. *Id.*

Subsequent to the decision in *León–Delfis*, the United States Supreme Court decided *Montejo v. Louisiana*, 556 U.S. 778 (2009), wherein it held that a defendant's waiver of his Sixth Amendment right to counsel may be valid in a custodial interrogation initiated by the police. *Id.* at 794-96. This represented a departure in the law that existed at the time of the *León–Delfis* decision, as the United States Supreme Court had previously held in *Michigan v. Jackson*, 475 U.S. 625 (1986), *overruled by Montejo*, 556 U.S. at 797, that a criminal defendant could not validly waive his Sixth Amendment right to counsel in a custodial interrogation initiated by the police. *Id.* at 636; *see also Hill*, 42 A.3d at 1095 n.9. Thus, the *Montejo* decision has negated the first two factors enunciated in *León–Delfis*. *See Hill*, 42 A.3d at 1095 n.9; *see also Hill*, 104 A.3d at 1248 n.3 (Eakin, J., Concurring).

Applying the remaining two factors announced in **_León–Delfis_** to the case at bar, our review of the record reveals that it bears no resemblance to that case. Here, Trooper LeVan testified that he provided Weaver with his **_Miranda_** warnings prior to the polygraph examination, expressly stating that the examination encompasses both the pre- and post-test interviews. N.T., 10/2/13, at 5-6. Furthermore, Weaver never requested counsel and was not represented, despite being informed of his right to counsel both during the May 7, 2013 interview and prior to the May 20, 2013 polygraph examination. **_See id._** at 5, 11, 27-28. We therefore conclude that Weaver was not entitled to a new trial on this basis.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/9/2015